*924 OPINION OF THE COURT
Alice Schlesinger, J.
Petitioners Canal Carting, Inc. and Canal Sanitation, Inc. have been in the business of private sanitation in New York City since 1959. Respondent the Business Integrity Commission of the City of New York was created in 1996 pursuant to Local Law No. 42 (1996) of the City of New York. On May 8, 2007, the Commission denied Canal’s application for renewal of its licenses, a prerequisite for doing business in New York City. Petitioner has commenced this CPLR article 78 proceeding to annul that determination.
In its May 8, 2007 denial, the Commission found that Canal lacked
“good character, honesty and integrity for the following independent reasons:
“(1) The Applicants Knowingly Failed to Provide Information and Documentation Required by the Commission
“(2) The Applicants Have Failed to Demonstrate Eligibility For a Trade Waste License “(3) The Applicants Were Found in Violation for Illegal Dumping and for Operating an Illegal Transfer Station.”
Canal takes issue with all of the findings, particularly because all were made without a hearing or a meaningful opportunity to be heard. Canal also urges that these findings are arbitrary and capricious and in fact unprecedented and that the determination must therefore be annulled. The Commission denies these claims and insists that its decision was reasonable and proper and based on compelling evidence. It further reminds the court of the Commission’s broad discretion and the court’s limited powers of judicial review. Finally, in a multipage answer, the Commission attempts to give evidentiary support for its three findings and the ultimate conclusion that Canal lacked sufficient good character, honesty and integrity to warrant the privilege of a license renewal.
It would be useful here to review both the history of Local Law 42 and the circumstances of this particular controversy because the purpose and the 10-year enforcement of this legislation are relevant to the proceedings below and this decision. As the challenged decision states in its first paragraph:
“Local Law 42, which created the Commission to *925 license and regulate the commercial carting industry in New York City, was enacted to address pervasive organized crime and other corruption in the industry, to protect businesses using private carting services, and to increase competition in the industry and thereby reduce prices.”
Following up on this initial statement, the next eight pages in a section entitled “Background” discuss first “The New York City Carting Industry” before Local Law 42 and then “Local Law 42, § 1” itself.[1] In a footnote appended to the caption “The New York City Carting Industry,” the decision points out that the “Applicant” Canal, in its response to the agency staffs denial recommendation, objected to the inclusion of this history as irrelevant since no allegations had ever been made connecting Canal to any illegal cartel activities. But the Commission disagreed, implicitly finding that this background information was in fact relevant. This court agrees.
The background given (at 2) depicts a crime-ridden industry, commercial carting in New York City, which “was operated as an organized crime-controlled cartel engaging in a pervasive pattern of racketeering and anticompetitive practices.” Evidence to this effect, presented at lengthy City Council hearings, gave rise to the enactment of Local Law 42. As further pointed out in the history section of the decision, numerous indictments were brought in both state and federal court and a large number of organized crime figures were convicted and sent to prison.
Local Law 42 gave the newly formed Business Integrity Commission regulating authority over this industry. Henceforth, no longer would the Department of Consumer Affairs have the power to license. That power would now be with the Commission. The new law was challenged but upheld. The Commission was established as the body to review license applications and deny them to those who lacked “good character, honesty and integrity.”
The decision by the Commission elaborating on its reasons for denying Canal a renewal license attempts to show how the three stated grounds for that denial provide a valid basis for the conclusion that Canal lacked these requisite criteria. But Canal, while acknowledging that its companies faced significant financial difficulties and were not always able to provide the precise materials requested, insists that it made substantial efforts to comply. More importantly, Canal insists that whatever *926 lapses there may have been, no basis exists to conclude that it lacked the requisite good character, honesty and integrity.
So what were the grounds? The first and undeniably most important ground, and the ultimate basis for the denial, was Canal’s knowing failure to provide the information and documentation required by the Commission. (See decision at 10-21.) The second ground, the failure to demonstrate eligibility for a trade waste license, is addressed in pages 21-28 of the decision and is closely tied to the first ground.
This first ground documents, in excruciating detail, the frustrating attempts made by the Commission’s staff, with limited success, to obtain information and documentation from petitioner, via its counsel, as to Canal’s financial responsibilities and obligations. The second ground reflects the Commission’s assessment that petitioner really cannot meet those responsibilities and obligations, thus making them unworthy to hold a license. Much of the justification for the ineligibility finding is duplicative of the information discussed under the first ground.
The final ground is that Canal was found in violation for illegal dumping and operating an illegal transfer station. These findings take up less than three pages and consist of a description of two incidents wherein Canal received summonses, both of which resulted in findings against them with civil penalties. First, there was a June 6, 2005 incident which led to a hearing before an administrative law judge and a finding of illegal dumping at the site of Canal’s Brooklyn property. The second, on January 23, 2006, involved allegations at that same location of stocking material which indicated operation of an illegal transfer station. Canal did not contest this second charge and was issued a fine. Petitioner insists both were isolated events wherein they had no intent to commit these violations. Nonetheless, findings were made against Canal as to both.
Some background is necessary vis-a-vis Canal’s license history. Its two companies were issued trade waste licenses on February 25, 2002. The licenses were due to expire on January 31, 2004. However, when originally granted, the licenses included a condition that the companies retain a monitor. In this regard Forensic Investigative Associates was appointed to review Canal’s operations and file periodic reviews. Although the monitorship was not renewed, during its tenure, Forensic did document sloppy record keeping and inadequate financial records, including a “totally inadequate bookkeeping system.” In a final report of April 19, 2004, the monitor did observe some improve *927 ment in Canal’s petty cash controls and financial sophistication, but this followed highly negative interim reports.
Canal then filed applications for renewal of its trade waste licenses, the first one on January 26, 2004 for renewal for the period from February 1, 2004 to January 31, 2006 and the second on December 21, 2005 for renewal of the licenses from February 1, 2006 to January 31, 2008. These applications were the ones pending when, on February 15, 2007, the Commission’s staff issued a recommendation to the Commission that the applications be denied.
On April 9, 2007,[2] Canal’s counsel Vincent Dotoli responded, sharply disputing the findings and recommendation and asking for a hearing to resolve the conflicting positions. Alternatively, Dotoli asked the Commission to defer any decision until the Bankruptcy Court determined a reorganization plan vis-á-vis Canal’s chapter 11 application. Dotoli indicated he would submit status reports to the Commission during that time. The response was supported by sworn affidavits from Canal’s principals.
However, as stated earlier, on May 8, 2007, the Commission issued its denial of the renewals, and, in doing so, unanimously accepted the recommendation of its staff virtually verbatim, although the decision did comment on Dotoli’s submission, generally finding it insufficient and unconvincing. Canal urges that this denial was arbitrary, unduly harsh, and violative of its due process rights.
It is a close question. From a technical reading of various provisions of Local Law 42, which the Commission cites in both its decision and its answer to the petition, one could find some justification for the Commission’s actions. For example, the decision refers to Administrative Code of the City of New York § 16-509 (b) wherein “[t]he commission may refuse to issue a license or registration to an applicant for such license . . . who has knowingly failed to provide the information and/or documentation required by the commission . . . .”
This failure is the essence of the denial at issue here. During a 17-month period from April 2005 through September 2006, Ms. Sheryl Levine, the Commission’s special counsel and the staff member in charge of this investigation, repeatedly sought information and documents as to Canal’s financial health and outstanding liabilities. Many extensions of time were requested *928 by Canal’s attorney Vincent Dotoli and granted by Ms. Levine. Many times, Dotoli asked for opportunities to come in with the company’s principals to discuss the issues. These requests were denied. At the end of this period, on September 27, 2006, the Commission received a letter from counsel that Canal had filed a petition for chapter 11 reorganization two days earlier. These petitions listed many nongovernmental debts, as well as several million dollars owed to both the IRS and New York State for unpaid taxes.
In January of 2007, Dotoli sent another letter containing interim income statements for September through November 2006 attempting to show Canal’s efforts at becoming more responsible and financially viable. However, the Commission found that, during the previous 17-month period with countless requests for information and documentation, Canal had still failed to provide significant information in a number of areas. The requested information included a valid certificate of incorporation for Canal Sanitation, Inc. and specific information regarding a number of judgments filed by the New York City Department of Finance, the New York State Labor Commission, the New York Workers’ Compensation Board, and other state and federal entities.
Dotoli and the principals of Canal, Frank Campo and Nicholas Infantino, in their sworn affidavits to the Commission, refuted some of the details of the charges. Even more significantly, they challenged the underlying assumption that Canal was intentionally and willfully withholding information and documents. They explained that the extensions were requested when the information was not available or when Dotoli himself had to confer with his clients. New counsel for Canal in this petition insists that Canal never intended to obstruct any investigation, nor was it ever told that its actions were perceived in that manner.
Petitioner argues that Dotoli used his best efforts to keep the Commission apprised of the status of Canal’s quest for documents to show that debts were being paid, liens were being satisfied, and plans with the various tax agencies were being worked out. Counsel insists that Canal never refused to provide information and at all times acted responsibly by continuing to negotiate with its creditors and with the State in making payments toward its outstanding obligations.
The papers do document a myriad of letters going back and forth between Levine and Dotoli. Ultimately, the Commission *929 concluded that these exchanges failed to meaningfully comply with its legitimate requests for documentation. But petitioner urges this conclusion was unwarranted, arguing instead that the letters show an attempt by Canal to work toward a resolution of its financial difficulties. In an effort to show that a payment plan was being worked out, Canal also points to four letters from its tax attorney Norman Berkowitz which outlined meetings, submissions and discussions he had had with the State. In fact, in a letter dated September 29, 2006, the Commission was told that both the State Department of Taxation and Finance and the IRS were willing to work with Canal as part of the bankruptcy reorganization. Another example given by petitioner of its attempts at resolving debts and liens was the $50,962.44 reduction of its debt for transfer station invoices so that, in September of 2006, only $24,468.60 remained unpaid.
In August 2006, Levine found out, as Canal apparently did, that, in addition to large amounts owed to New York State and other creditors, there was a multimillion dollar IRS tax lien. This lien was apparently of great significance to both parties. It seems to have convinced Levine that the situation was hopeless, leading her to suggest that Canal consider selling the business. The lien also led Canal to file for chapter 11 the following month. But the question remains whether Canal’s obviously dire financial strait warranted the Commission’s denial of the license renewals, which effectively put Canal out of business.[3]
As to the second finding, that the applicant has failed to demonstrate eligibility for a trade waste license, respondent argues that the ability of a licensee to manage its finances is directly related to its fitness to retain a license. While petitioner does not dispute that principle, it vigorously disputes respondent’s claim that Canal has failed to demonstrate its ability to manage its finances. Petitioner argues it does and that by filing for reorganization on September 25, 2006, it was attempting to do precisely that. The Commission cites to the Administrative Code provision that requires licensees to maintain audited financial statements, business records and the like (§ 16-520 [c]) and Commission rules that require the timely payment of taxes (17 RCNY 1-09). It contends that Canal has failed to provide such truthful, accurate and timely information.
*930 However, petitioner insists that it never made false or misleading statements to the Commission. Counsel maintains there were no material changes, as that term is defined in 17 RCNY 1-01, that required them to come forward with additional information unless specifically requested. Thus, when Canal was asked to provide information on tax liens and/or unpaid taxes, it responded as soon as it was able to with accurate information. In this regard Canal notes that no inquiry was ever made to Dotoli about IRS liens until mid-August 2006. On the subject of notices of violations issued to Canal, counsel points out that all the violations were of an administrative nature based again on poor financial records, and that Canal was dealing with those problems by retaining a different accountant with a demonstrated ability to address this issue.
In summary, Canal argues that, while it is true that it had fallen behind in the payment of its debts despite its best efforts, this problem was due to circumstances beyond its control and had nothing whatsoever to do with organized crime or corruption. Therefore, the financial difficulties should not serve as a basis for a determination of unfitness for renewal of its license, Canal asserts.
It is interesting to note that, on this point, as well as in other parts of the decision, the Commission comments adversely on matters of credibility. For example, when discussing Canal’s explanation that the bankruptcy filing was an effort to prove “future financial responsibility,” the Commission said (at 22): “The explanations offered lack credibility and do not satisfy Canal’s burden to demonstrate eligibility to hold a trade waste license.” As discussed more fully below, this type of evaluation of matters of credibility without a hearing or the receipt of sworn testimony does support petitioner’s argument that the determination is problematic.
The third basis for denial of the renewal licenses was the applicant’s two adjudicated violations for illegal dumping and for operating an illegal transfer station. As noted earlier, these both occurred on Canal’s property at 39 Ferris Street in Brooklyn. The first offense occurred on June 6, 2005 and the second on January 23, 2006. The decision recites the charges and their outcome and notes that Canal’s defense or explanation that it had no intent to commit these offenses is irrelevant under the statute. The activities themselves constitute the violation, and these activities are simply not permitted or are allowed only with a permit from the Commissioner.
*931 Petitioner refutes the above analysis by minimizing the activities themselves. Counsel also points out that only one finding against Canal was actually made, the one involving illegal dumping. The violation regarding an illegal transfer station was simply not contested and a fine was accepted. Further, though “intent” may not be required, counsel argues it is clear from these isolated incidents, in 50 years of business, that it was not Canal’s intent to be involved in these prohibited activities. Counsel also indicates that the payment of these fines was included in several Environmental Control Board (ECB) settlement packages.
As noted earlier, this is a difficult case because while, on the one hand, the Commission can show technical violations of the code and various rules, it is far from clear that such violations prove that the applicant lacks “good character, honesty and integrity.” Those are the words that respondent chose in summarizing its denial of the applications. And there is a valid reason for this choice of words, a reason petitioner emphasizes in its argument that the decision is arbitrary, capricious or unjustly harsh. It is that, despite Canal’s failure to cooperate fully and comprehensively, to run a tight financial ship, or to timely pay its tax obligations, violations and fines, there is nothing to suggest either implicitly or explicitly that Canal committed any of the offenses that Local Law 42 was designed to combat.
The Commission’s decision, in its early pages, discussed the history of the New York City carting industry, a “black hole,” as described by the Second Circuit in Sanitation & Recycling Indus., Inc. v City of New York (107 F3d 985 [1997]). The decision also discussed how the circumstances of a corrupt and criminal industry brought about the enactment of Local Law 42, a law intended to root out cormpt and unfair practices, and the creation of the Commission to help accomplish this goal by issuing or refusing to issue licenses.
Pursuant to Administrative Code § 16-509 (a) (i)-(x), the Commission may consider, among other things, the following:
(i) failure to provide truthful information,
(ii) a pending indictment or criminal action which reflects directly on the applicant’s failure to carry out carting duties,
(iii) conviction of certain criminal offenses,
(iv) a finding of liability in a civil or administrative action that bears a direct relationship to fitness to conduct a carting business,
(v) commission of a racketeering activity or known association with a person convicted of this conduct,
*932 (vi) association with a member or association identified as an organized crime group,
(vii) association with a principal in a predecessor trade waste business where a denial of a license would have been authorized,
(viii) current membership in a disallowed trade association,
(ix) holding a prohibited position in such a trade association,
(x) failure to pay any tax, fine, penalty or fee for which the applicant has been found liable or where a judgment has been entered.
Arguably, respondent can claim that several of these grounds apply to petitioner, such as clauses (i), (iv) and (x). However, petitioner adamantly refutes those allegations in sworn affidavits, the most significant being failure to provide truthful information. The principals of Canal and their prior counsel Dotoli insist that their application and responses were at all times truthful.
But more significantly, as is pointed out in present counsel’s argument to this court, never before has there been an instance where the Commission has denied a trade waste license without a finding or even an allegation which included one or more of the following: (1) being a member of organized crime, (2) racketeering, (3) a principal convicted of a crime, (4) association with organized crime figures, (5) board member of a criminal cartel, (6) business with organized crime, (7) nondisclosure of a principal, (8) operating as an unlicensed hauler, (9) applicant gave false testimony, (10) applicant engaged in predatory pricing and efforts to prevent independent companies from entering the New York City market, (11) bribery of public officials and/or police officers, (12) business records falsified to conceal crime, (13) participation in property rights grievances, (14) failure to disclose crime to the Commission, (15) refusal to accept monitor and/or pay monitor fees, or (16) extensive illegal dumping. To support his argument, counsel obtained all of these decisions via a request under the Freedom of Information Law and included them as exhibits to his papers. He urges that the prior decisions prove that the instant denial by the Commission was at sharp variance with its 10 years of decision making.
At oral argument, the court requested the parties to reappraise their positions. In an effort to counteract petitioner’s argument that the denial was unprecedented, the City wrote a letter citing two of its prior denials (out of a total of 57 license application denials and 34 registration applications) which *933 purportedly presented factual scenarios similar to the case at bar: Marraflo Contr, Inc. and Vales Constr. Corp. However, the City acknowledged that in Marraflo there was “background information” given in the denial decision which showed prior criminal activity by the company’s predecessor.
In response to this letter petitioner’s counsel insists that his original point, even vis-a-vis these two cases, was valid. He cites multiple places in Marraflo where the Commission describes prior and continuing associations with named criminals. And, frankly, even the City’s letter points out that the “background information” discussed in Marraflo was included “to explain why the failure to satisfy the judgments of the predecessor was relevant.” Thus, it seems clear that the prior criminal association was, at least in part, relied upon in the denial, though perhaps not explicitly.
Vales involved a denial of an exemption application for a registration to operate a trade waste business. That company had been given a temporary permit while its application was being considered. The City denied the application because, after six months, Vales had not provided proof of satisfaction of any judgment for fines and penalties owed to the ECB. Also, it appears that Vales had taken no steps to restore the matter to the calendar or enter into a payment plan. Counsel contrasts that situation with Canal’s where all ECB matters were restored and ultimately resolved. Many other differences were noted as well.
As to illegal dumping and operating an illegal transfer station, counsel points out that all the prior denials based on such activities either involved continuing violations over a long period of time, not isolated instances as was the case here, or else were accompanied by other more serious offenses.
Petitioner argues in the first instance that his due process rights have been denied by failing to provide him with a formal hearing where sworn testimony could be taken and other indicia of a hearing, such as cross-examination of adverse witnesses, would apply. Counsel argues that, at the very least, Canal has a property interest in its 50-year business, given that the Commission had granted it a license in 2002 pursuant to Local Law 42. Respondent argues otherwise.
Under the circumstances here, Canal has no right to a formal hearing for the following reasons. First, the text of section 16-518 of the Administrative Code does not require a hearing. Rather, it states: “A hearing pursuant to this chapter may be conducted by the commission, or, in the discretion of the com *934 mission” (Administrative Code § 16-518 [a]). The decision to hold a hearing is a discretionary one, rather than a mandatory one or a right held by a licensee. Further, as stated in Matter of Daxor Corp. v State of N.Y. Dept, of Health (90 NY2d 89, 98 [1997]), when a license is being revoked, there must be a hearing, but there is no similar right for initial applications or renewals. Here, Canal is seeking renewal.
What is more, not much would be served by a formal hearing in this case. The staff has stated its position and persuaded the Commission to unanimously accept its recommendation. The petitioner was given an opportunity to challenge that recommendation and did so in a lengthy document submitted to the Commission before the May 8, 2007 decision was made. The submission was a comprehensive denial of the charges and an explanation of the events by Canal’s counsel and its principals in sworn affidavits. And the decision addressed in some degree those refutations and explanations.
Therefore, the court finds no violation of petitioner’s rights from a procedural perspective. In Mathews v Eldridge (424 US 319 [1976]), a decision cited in Daxor, the United States Supreme Court set the parameters for deciding when a hearing is mandated, outlining the various factors to be balanced. The matter involved the termination of Social Security disability benefits to an individual without a formal hearing. The Court upheld the determination, explaining that the essence of due process was the requirement that one in serious jeopardy of a serious loss be given notice of the case against it and an opportunity to meet it. That requirement has been satisfied here.
However, that finding does not conclude the matter. Since a hearing was not mandated, the issue is not whether substantial evidence exists to support the decision, but rather whether the decision itself was arbitrary and capricious or shocking to one’s sense of fairness. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222 [1974].) Here it was. The decision is unprecedented in the history of enforcement of Local Law 42. The conclusion that Canal lacks the “character, honesty and integrity” entitling it to renewals is wholly unconvincing and irrational, particularly in light of the absence of a single allegation or finding which supports the rationale for the increased scrutiny mandated by Local Law 42. And, finally, considering that Canal had been in business for 50 years, it is shocking to one’s sense of fairness and unduly harsh to effectively close the *935 business in New York for what essentially constitutes poor or ineffective business management.
This court can understand the frustrations of the staff in their 17 months of dealing with Canal’s attorney. That interaction was often incomplete and less than satisfactory. Added to this was the large amount of public and private debt that petitioner had incurred, sufficient to have Canal file for chapter 11 reorganization. But the denial of renewal licenses, sufficient to effectively put Canal out of business, is not warranted based on such failures. It is shocking in its harshness and punitive quality.
Accordingly, it is hereby adjudged that the petition is granted, the May 8, 2007 denial is annulled, and the matter is remanded to the Commission for reconsideration consistent with this court’s findings.

. The entire decision is 30 pages, not including the signature sheet.

. The letter is incorrectly dated April 9, 2006.

. With respect to Canal’s dire financial situation, Dotoli did attempt in his various communications with Levine to explain why things had gotten so bad, such as low regulated rates and very high fuel costs. One could assume as well that prior poor record keeping and financial mismanagement were contributing factors.